### MESTLER v. JEFFRIES.

1. VENDOR AND PURCHASER — REMEDIES OF PURCHASER — ACTION FOR PRICE PAID—EVIDENCE.

Where, in an action for payments made on the purchase price of a fruit farm abandoned because of fraud in the sale, the declaration does not state that there were not as many trees as represented, evidence tending to show that there were not as many trees as represented is inadmissible.

2. BROKERS — REAL ESTATE — REPRESENTATIONS — AUTHORITY OF BROKER.

Where a farm was listed with a broker for sale, who in turn listed it with another broker, who made certain representations in regard to the farm, and there is evidence tending to show authority to make the representations, the court should not charge that the seller is bound by the representations, but should leave to the jury as a question of fact the question whether there was an agency.

3. VENDOR AND PURCHASER — FRAUD — RECOVERY OF PURCHASE PRICE—RESCISSION.

　　Where the purchaser of a farm discovered the fraud practiced upon him in its sale soon after taking possession, but retained possession for nearly a year, and made his payments as provided by his contract, he was not entitled to then rescind the contract and recover the full amount of his payments on the purchase price.

Error to Van Buren; Carr, J. Submitted January 30, 1906. (Docket No. 74.) Decided September 20, 1906.

Assumpsit by Charles Mestler against Roberson Jeffries to recover payments made on a contract for the sale of land rescinded on the ground of fraud. There was judgment for plaintiff, and defendant brings error. Reversed.

*Anderson & Warner*, for appellant.

*Thomas J. Cavanaugh*, for appellee.

MOORE, J. On or about the 1st of April, 1904, plaintiff purchased from defendant a fruit farm, and soon thereafter went into possession of it. It is his claim that fraudulent statements upon which he relied were made to him. He abandoned the farm in April, 1905, and commenced this action. Upon the theory that he had rescinded the contract, the jury rendered a verdict in his favor for the full amount of the payments made by him. The case is brought here by writ of error.

It is said the court erred in allowing testimony that there were not as many trees upon the farm as was represented by defendant. The only reference to the number of trees in the declaration is in the first count. It there averred that representations as to the number of various kinds of trees were made stating the numbers and kinds. It is not stated therein that there were not as many as were represented, nor is it stated that reliance was placed upon this representation. We think the testimony was improperly admitted.

The record discloses that the farm was listed with real estate agents at Mattawan, who in turn listed it with a Chicago agency through whom the plaintiff's connection with the transaction was brought about. The Chicago agency furnished a written memorandum to plaintiff. This was received in evidence. The defendant denied the authority of these agents to make the statement. There was testimony tending to show authority. The trial judge instructed the jury that defendant was bound by these statements. We think the jury should have been instructed that if they found the agency existed then the defendant would be bound; but in view of the testimony, whether the agency did exist was a question of fact to be submitted to the jury.

The important question in the case is whether it should have been submitted to the jury upon the theory that plaintiff had rescinded the contract because of fraud, and, if so, that he was entitled to recover all he had paid on the purchase price.

The following special findings were submitted to the jury on the part of the plaintiff and answered:

" 1. Did Mr. Jeffries, by his acts and conduct after Mr. Mestler discovered the fraud, induce him to keep possession of the lands and to make the payments indorsed on the contract ?

"*A.* Yes.

"2. After the fraud was discovered, were the parties negotiating a settlement of their differences up to about the time the contract was rescinded by the plaintiff?

"*A.* Yes."

On behalf of the defendant:

"*First.* Did Mr. Mestler know of the defects of which he now complains on October 1, 1904?

"*A.* Yes.

"*Second.* Did Mr. Mestler, with knowledge of the matters of which he now complains, continue to make payments on the contract of purchase, and to treat this land as his own?

"*A.* Yes.

" *Third.* Did the letter of January 3, 1905, written by Mr. Jeffries to Mr. Mestler, refer to the original contract for the sale of the farm ?

" *A.* Yes.

" *Fourth.* Did Mr. Mestler, after receiving this letter of January 3, 1905, make the January, 1905, payment called for by the original contract of purchase ?

" *A.* Yes."

It is clear from the record that as early as in September, 1904, the plaintiff learned what he claims constituted the fraud perpetrated upon him. Did he rescind the contract then ? He admits he did not, but claims because of what occurred he was under no obligations to do so. It becomes important, then, to inquire what was done. A payment was made when the contract was made, and by its terms $40 was to be paid monthly thereafter. Plaintiff testified, and he is corroborated by his wife, that after he had learned the facts which he claims showed the fraud, in September, 1904, the defendant came to him and wanted some money; that he called his attention to the situation, and told him something had got to be done; that he would have to make a settlement in some way; that defendant told him he would make it all right.

" That was the understanding that I left him with, that he would do something about it to make it satisfactory to both."

He and his wife went to see defendant October 1st; plaintiff's testimony is:

" I told Mr. Jeffries I had come over to make a settlement with him. I told him I had not made near the money on the place he said I would; I practically had not made anything on my debt and I told Mr. Jeffries that I had harvested the fruit, and I did not see where the money is coming from. I said, ' I cannot see my way clear; I have hardly got money enough to bring my family back to the city, and pay my board so as to get started to work again. There has got to be something done about this thing. You agreed to fix this all right. I want you to cut the payments down. I consider what I paid for that place is too much, and I want a reduction on the place;

if I cannot have that I will have to do something else about it, that was the understanding.' He told me that he did not consider that he was to blame for the condition of the fruit. Jeffries said if I kept the payments up until January, he would fix it all right with me."

After this conversation he continued to make the payments monthly. On the second of January, 1905, he wrote defendant as follows:

"*Dear Sir:* Ever since my visit to your home last fall, Oct. 1st, 1904, I have been thinking the matter over and over, of how I have been deceived into buying your place. * * * If I had known the peach trees and the vineyards were in the condition they were I would not have them for half the price paid, as I based my hopes on the fruit paying for the place, and after my harvest was over I find, after paying my help, I have saved off from the place $35.00 and I went to you and told you how I stood. You merely passed it off in a light way. Of course, I did not expect anything different from you under the circumstances. I asked you if you would cut the payments down, and you said you were figuring on the money got of me to pay another debt until January. So January is here and I have paid each month, as I agreed, so you could meet your debts, and now I must ask you to consider me a little. * * * I have been to see an attorney, and he had me explain the whole deal and I showed the correspondence passed between us and told him all. And he said I was very foolish to bother with such a place as he owns 2 such, and he said a place in that condition was worthless, and he told me I would not have any trouble getting every cent I paid on the place back. I realize the cost of such controversy although he agreed to do or collect the money for 10 per cent. Such an ordeal would only cause hard feelings all around. I have a proposition to make to you in which it would be satisfactory to me. I will pay the January payment, and that will make $510 up to January and then I would like to have you wait until fall when the grapes are off on the market. I will of saved and be able to make up the difference. I am as anxious to pay for the place as you are to get your money for the place. I hope you will see the situation in the right light and accommodate me as I will assure you I am not able to work the farm this summer unless I can make such arrangement as I will

have to hire a man as I intend to hold my position until I get $1,000 paid on the place. I figure I will be able to pay $1,000 a year from this spring if nothing happens and then I would go and work the place myself as my wife does not care to stay alone unless I am there. I hope you will not be offended at this letter, but the situation demands something be done. Of course, if you can not see fit to compromise I will have to do something else. Please let me know as soon as possible as I will not send the January payment until I hear from you."

On the third of January the defendant replied as follows:

"OSHTEMO, MICH. Jan. 3, 1905.
"Mr. MESTLER,
        "Chicago, Ill.
"*Dear Sir:* Yours of January 2nd received, contents noted. In answer will say, entered contract with you to sell my farm. Am ready on my part to fulfill the contract to the letter. Shall expect the same of you.
                "Yours respectfully,
                        "ROBERSON JEFFRIES."

About the middle of the month plaintiff sent the $40, and defendant sent him a receipt reading as follows:

"$40.00                                Jan. 17, 1905.
"Received of Mr. Charles Mestler forty dollars to apply on land contract.
                        "ROBERSON JEFFRIES."

Other correspondence followed. No settlement was arrived at and, as before stated, in the early part of April, 1905, plaintiff abandoned the farm, and commenced this suit.

It is but just to say the defendant gives an entirely different version of the transaction. The law in relation to the rescission of contracts on the ground of fraud has been declared many times in this court. It is to the effect that a party intending to rescind a contract because of fraud must be prompt in communicating the fraud when discovered, and consistent in his notice to the opposite party of the use he intends to make of it. *Jones* v. *Disbrow*, Har. Ch. (Mich.) 102; *Street* v. *Dow*, Har. Ch. (Mich.)

427; *Galloway* v. *Holmes*, 1 Doug. (Mich.) 330; *Craig* v. *Bradley*, 26 Mich. 353; *Hubbardston Lumber Co.* v. *Bates*, 31 Mich. 158; *Dunks* v. *Fuller*, 32 Mich. 242; *Farrington* v. *Smith*, 77 Mich. 550; *Dailey* v. *King*, 79 Mich. 573; *Condon* v. *Hughes*, 92 Mich. 367; *Wylie* v. *Gamble*, 95 Mich. 575; *Bedier* v. *Fuller*, 106 Mich. 342; *Warnes* v. *Brubaker*, 107 Mich. 440; *Reed* v. *Ismond*, 110 Mich. 16; *Bennett* v. *Hickey*, 112 Mich. 383; *Speicher* v. *Thompson*, 141 Mich. 654. When plaintiff learned of the fraud two courses were open to him, he might rescind the contract, and recover that with which he had parted, or he might retain the property, and recover his damages for the fraud. As before stated, plaintiff learned of the alleged fraud as early as September, and communicated with defendant in relation thereto. Did he indicate to defendant that he intended to rescind the contract? On the contrary, if his testimony is to be believed and his letters mean what they say, his position was that he had been defrauded and must be made good by a reduction in the price of the land and in the amount of the monthly payments. This position was inconsistent with the idea of a rescission. The result of the trial has been that plaintiff has had the use of the farm for a year, during more than one-half of which he had knowledge of the fraud, and has also been permitted to recover back all he paid.

Judgment is reversed, and new trial ordered.

McALVAY, GRANT, OSTRANDER, and HOOKER, JJ., concurred.